FILED
2023 Jun-27  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-01630-AMM-NAD |
| | ) | |
| ALABAMA DEPARTMENT OF | ) | |
| CORRECTIONS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Christopher Smith filed an amended *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights arising from a traffic stop and the subsequent issuance of a warrant for his arrest.  Doc. 15. Plaintiff Smith names the following Defendants:  the Alabama Department of Corrections (ADOC), Lieutenant Randall Sandlin, Investigator M.C. (Matthew) Dawkins, and "Internal Investigations."  Doc. 15 at 1–3.

Smith alleges that Defendant Sandlin beat him in connection with a traffic stop and seizure, and that Smith then was improperly incarcerated based on a false warrant supported by Defendant Dawkins.  Doc. 15.  Liberally construed, Smith's amended complaint alleges claims arising from his arrest and parole revocation, a

Fourth Amendment claim for excessive force,[1] a due process claim for damage to his vehicle, and vicarious liability claims against the ADOC and "Internal Investigations."  Doc. 15.  Smith seeks release from custody and money damages. Doc. 15 at 7.

Consistent with the usual practices of this court, this matter was referred for a preliminary report and recommendation.  *See* 28 U.S.C. § 636(b)(1); *McCarthy v. Bronson*, 500 U.S. 136 (1991); N.D. Ala. Local Rule 72.1.  For the reasons stated below, this report recommends that the court grant Defendants' motions for summary judgment (Doc. 25; Doc. 35).

## BACKGROUND

### A.    Factual Background

#### 1.    Smith's sworn allegations

Smith alleges the following facts:  On November 17, 2019, Smith—who was on parole at the time—was driving near the Donaldson Correctional Facility at approximately 4:00 a.m., after responding to a work-related call.  Doc. 15 at 7, 9–11.  As he was driving, Smith saw a man on the side of the road near a white truck. Doc. 15 at 11.  Smith stopped to see if the man needed help, but the man asked Smith his name and then drew a gun on Smith and ordered him to exit his vehicle.

---

[1] Smith specifically alleges an Eighth Amendment claim (*see* Doc. 15 at 3), but he was not in custody at the time of the relevant incident.  As a result, any excessive force claim would be grounded in the Fourth Amendment.  *See, e.g.*, *Crocker v. Beatty*, 995 F.3d 1232, 1246 (11th Cir. 2021).

Doc. 15 at 11.  Smith began to drive away, at which point the man with the gun shot at him.  Doc. 15 at 11.

Smith called 911 and spoke to dispatch for the Bessemer Police.  Doc. 15 at 11.  Because he was driving on a dead-end road, Smith had to turn around back toward the man who had shot at him.  Doc. 15 at 11.

When Smith approached the point in the road where the man had shot at him, Smith saw a van with blue lights; 911 dispatch told Smith that the van was not affiliated with the Bessemer Police.  Doc. 15 at 11.  Dispatch told Smith that the van was from Donaldson, and that Smith should pull over.  Doc. 15 at 11.  When Smith complied with the 911 dispatcher's instructions and then got out of his vehicle, "a correctional officer beat" him, "kick[ed]" him "three times in [his] side with handcuff[s] on," and placed his knee on Smith's back. Doc. 15 at 11.  Smith was "beaten by a correctional officer Lt. Randall Sandlin," resulting in a swollen head, bruised ribs, and pain around his heart.  Doc. 15 at 7.

Bessemer Police officers then arrived, and called an ambulance to take Smith to the hospital because he was having trouble breathing.  Doc. 15 at 11.  At UAB West Hospital, a doctor told Smith that he needed a pacemaker.  Doc. 15 at 11.  Smith wanted a second opinion from his own doctor, so he signed a statement refusing medical care.  Doc. 15 at 11.  Meanwhile, his vehicle, money, and phone had been taken by "the correctional officer."  Doc. 15 at 11.

3

On March 3, 2020, at Smith's parole revocation hearing, Defendant Sandlin testified that he shot at Smith in an attempt to make him stop his vehicle.  Doc. 15 at 11.  Although Sandlin testified that he suffered bruising to his abdomen, which required medical attention, Sandlin did not actually receive any medical care.[2]  Doc. 15 at 11–12.  Sandlin also falsely testified at the parole revocation hearing that Smith jumped out of the ambulance and did not go to the hospital.[3]  Doc. 15 at 12.

Smith has been incarcerated since February 6, 2020, when he was "thrown in jail on false charges."  Doc. 15 at 7, 12.  Smith's parole was revoked, and he was sentenced to serve an additional five years because of Sandlin's "false statements under oath."  Doc. 15 at 12; Doc. 41 at 3.

Smith reported the incident to Defendant Dawkins, who worked for the ADOC's Internal Investigations division, and who then failed to properly investigate the incident and wrongly signed an affidavit supporting a warrant for Smith's arrest.  Doc. 15 at 10, 12.  Dawkins further failed to properly impound

---

[2] As explained below (*see* Factual Background A.2 *infra*), Sandlin avers and presents evidence that he was injured when Smith hit him with his vehicle.  Doc. 25-1 at 2.

[3] Smith has submitted a bill for the ambulance transport, purportedly showing "where they pick[ed] [him] up and where they drop[ped] [him] off."  Doc. 15 at 12, 14.

Smith's vehicle for two days, which allowed for damage to the vehicle.[4]   Doc. 15

at 12.

Smith requests that the court release him, award him the cost of damage to

his vehicle and loss of business, and compensate him for his pain and suffering.

Doc. 15 at 7.   Smith also requests that each of the four Defendants pay him

$10,000,000.00.  Doc. 15 at 7.

### 2.      Defendant Sandlin's factual responses

Defendant Sandlin, a Correctional Canine (K9) Handler employed by the

ADOC, filed an affidavit in response to Smith's allegations.  Doc. 25-1.  Sandlin

avers as follows:   At approximately 4:00 a.m. on November 17, 2019, Sandlin

received a call from his supervisor, non-party Captain David Gardiner, requesting

K9 assistance around the perimeter of Donaldson based on reports of suspicious

activity.  Doc. 25-1 at 1; *see* Doc. 25-6 at 1.  While engaged in pursuit of a possible

escaped inmate or suspect throwing contraband over the fences of the facility,

Sandlin proceeded to the end of Warrior Lane and Taylor's Ferry Road.  Doc. 25-1

at 1–2.

At approximately 4:16 a.m., Sandlin saw a white Chrysler (later determined

to be driven by Smith) approach on Taylor's Ferry Road.  Doc. 25-1 at 1–2.  The

vehicle stopped, but the driver did not provide any identification and would not

[4] Smith avers that he has pictures of the damage to his vehicle (Doc. 15 at 12), but
he has not submitted any such evidence.

answer questions about why he was near Donaldson.  Doc. 25-1 at 2.  The vehicle drove off at a high rate of speed, but then returned traveling in the opposite direction.  Doc. 25-1 at 2.

Sandlin and Gardiner approached the vehicle and identified themselves as K9 officers with the ADOC.  Doc. 25-1 at 2.  The driver (Smith) became irate, announced that he was calling the police, and drove off again.  Doc. 25-1 at 2.  In the process, the driver's sideview mirror of the vehicle hit Sandlin's rib cage.  Doc. 25-1 at 2.  Sandlin used his radio to announce that the white Chrysler was leaving the area and had tried to run over Sandlin.  Doc. 25-1 at 2–3.  Later the same day, Sandlin was diagnosed with bruised ribs.[5]  Doc. 25-1 at 3; Doc. 25-2 at 5.

Sandlin specifically avers, "I did not fire my weapon at Smith, nor did I touch him at all.  He never got out of his car in my presence.  I did not handcuff or hit him.  He hit me with his car and drove off at a high rate of speed."  Doc. 25-1 at 3.  Sandlin avers that, after Smith drove off, Sandlin had no further contact with Smith until Smith's March 3, 2020 parole revocation hearing.  Doc. 25-1 at 2.

---

[5] The medical records produced by Sandlin include a November 17, 2019 body chart from Donaldson, which reflects contusions to his left side rib cage and hip.  Doc. 25-3 at 1.  Sandlin then went to UAB Hospital, also on November 17, 2019.  Doc. 25-2 at 3.  Those records do include the following notation:  "Time seen: Date 2/12/2015."  Doc. 25-2 at 3.  But every other date on the records is "11/17/2019."  Doc. 25-2 at 3, 5.  Those records also reflect that x-rays were taken on November 17, 2019, which were negative for any acute fracture or other injury.  Doc. 25-2 at 5.  Sandlin was diagnosed with bruised ribs and discharged.  Doc. 25-2 at 5.

### 3.    Defendant Dawkins' factual responses

In a sworn declaration, Defendant Dawkins averred the following:  On November 17, 2019, Dawkins—who was employed by the Law Enforcement Services Division—was contacted by his supervisor to investigate a purported assault against Defendant Sandlin.  Doc. 35-9 at 1.  Dawkins arrived at the scene, and was informed that non-party Sergeant Joshua Sanders had discharged his weapon in connection with the driver of the white Chrysler (i.e., Smith) evading pursuit, that contraband had been recovered, and that two suspects were detained, but that the driver (Smith) was not in custody.  Doc. 35-9 at 1–2.

As part of his investigation, Dawkins interviewed at least eight people, including Sandlin and Sanders.  Doc. 35-9 at 2–3.  Sandlin told Dawkins that, when Smith attempted to drive around Sandlin, the sideview mirror of Smith's vehicle struck Sandlin's stomach and rib cage.  Doc. 35-9 at 3.  Sanders told Dawkins that he had received a radio call that Sandlin had been hit by a suspect in a vehicle, that he tried to stop the vehicle, and that when the vehicle did not stop he fired his weapon into the ground as a warning.  Doc. 35-9 at 2.

On November 17, 2019 (the day of the incident), Smith's vehicle was recovered and transported to Donaldson.  Doc. 35-9 at 3.  Dawkins contacted a wrecker service to move Smith's vehicle to a secure location to be inventoried and so that a search warrant could be obtained.  Doc. 35-9 at 3.  After obtaining a

search warrant for Smith's vehicle, Dawkins found Smith's identification card and learned that he was an Alabama state parolee.  Doc. 35-9 at 3.  Dawkins obtained a warrant against Smith for second degree assault based on Sandlin's injuries.  Doc. 35-9 at 4.

Although Smith later arranged a meeting with Dawkins, Smith then told Dawkins that his attorney would reschedule the meeting.  Doc. 35-9 at 4.  That did not occur, and Dawkins had no further contact with Smith.  Doc. 35-9 at 4.

### 4.    Other record evidence

Non-party Gardiner provided an affidavit averring the following:  Sandlin had set up a vehicle checkpoint at the intersection of Taylor's Ferry Road and Warrior Lane.  Doc. 25-6 at 2.  Gardiner went to Sandlin's location and was questioning another driver, when Sandlin told Gardiner that he saw a white Chrysler—which already had sped past him—returning and traveling in the other direction.  Doc. 25-6 at 2.  Gardiner stopped the vehicle and explained that he was investigating a report of suspicious activity at Donaldson.  Doc. 25-6 at 2.  The driver (later determined to be Smith) accelerated toward Sandlin, who was standing nearby, and struck Sandlin with the driver's sideview mirror of the vehicle.  Doc. 25-6 at 2.  Gardiner entered his vehicle, activated his lights and siren, and followed Smith.  Doc. 25-6 at 2.

When Gardiner caught up to the white Chrysler (Smith's vehicle), the

vehicle already had stopped.  Doc. 25-6 at 3.  The driver got out of the vehicle, and was handcuffed by non-party Sanders.  Doc. 25-4 at 1; Doc. 25-6 at 3.  Sanders later told Gardiner that Sanders had fired a shot into the ground when he saw Smith's vehicle approaching.  Doc. 25-4 at 1; Doc. 25-6 at 3.

A November 17, 2019 incident report is consistent with the averments from Sandlin, Dawkins, and Gardiner.  Doc. 25-4.  According to the incident report, Smith reported that he was having chest pains, and paramedics were called to the scene.  Doc. 25-4 at 1.  Smith was transported by ambulance to Princeton Hospital because of an elevated/irregular heart rate.  Doc. 25-4 at 1.  When the ambulance arrived at Princeton, Smith jumped out and ran away rather than going into the emergency room.[6]  Doc. 25-4 at 1.

In addition, on November 18, 2019, a warrant issued for Smith based on a second degree assault charge.  Doc. 25-7 at 4.  Smith was not arrested on this charge until January 13, 2020.[7]  Doc. 25-7 at 4; Doc. 25-8 at 2–3.  And, on account of that new assault charge, Smith's parole was revoked.  Doc. 25-8 at 1–7.  The

---

[6] Smith asserts that this is false.  Doc. 41 at 3.  But Smith offers no evidence supporting the assertion that he actually was seen by any medical provider at the hospital.

[7] According to the parole violation report, Smith was arrested on January 6, 2020, in Montgomery County, on unrelated failure to appear charges.  Doc. 25-8 at 1–2. Because Jefferson County had a custodial hold on Smith, he was released from Montgomery County into the custody of the Jefferson County Sheriff's Department on January 13, 2020.  *See* Doc. 25-8 at 2.

second degree assault charge remains pending in the Jefferson County Circuit Court, Bessemer Division.  Doc. 25-7 at 7; *see State of Alabama v. Christopher Smith*, 68-CC-2021-000664.00.

On March 3, 2020, a parole revocation hearing was conducted.  Doc. 25-8 at 5.  The parole records reflect that Smith testified at his parole revocation hearing that he drove through the police checkpoint because he was scared, and that he did not know if he struck the officer or not.  Doc. 25-8 at 6.  He further testified that "other correctional officers drew guns and dr[agged] him out of the vehicle."  Doc. 25-8 at 6.

The summary of the testimony from the parole revocation hearing also reflects that Sandlin testified that Smith drove through the checkpoint and hit Sandlin in the abdomen with his sideview mirror, which required medical treatment for bruising.  Doc. 25-8 at 6.  Sandlin also testified that "he heard the officers fire a shot to get the vehicle stopped after [Smith] drove through [Sandlin's] checkpoint the second time."  Doc. 25-8 at 6.

## B.    Procedural background

On September 15, 2020, Smith filed his initial complaint in the United States District Court for the Middle District of Alabama.  Doc. 1.  The complaint then was transferred to this court.  Doc. 3; Doc. 4; Doc. 5.  In response to an order to amend (Doc. 13), Smith filed an amended complaint (Doc. 15), which is the

operative complaint on these summary judgment motions.

In response to an order for special report (Doc. 20), Defendant Sandlin filed a special report, supported by affidavits and other evidence.  Doc. 25.  Smith filed an unsworn response, asserting that he testified at his parole revocation hearing that he did not intentionally strike Sandlin with his vehicle, and that Sandlin provided false testimony at his parole revocation hearing, among other things.[8] Doc. 27.  Defendant Dawkins later filed a special report, also supported by affidavits and evidence.[9]  Doc. 35.

On November 3, 2022, the parties were notified that the court would construe the special reports as motions for summary judgment, and Smith was notified that he had the right to respond to the summary judgment motions by filing affidavits or other materials.  Doc. 39.  Smith also was advised of the consequences of any failure to respond or comply with Federal Rule of Civil

---

[8] Both of Smith's responses to Defendants' summary judgment motions cannot be considered as sworn declarations pursuant to 28 U.S.C. § 1746, because he did not sign them under penalty of perjury.  Doc. 27; Doc. 41; *see Roy v. Ivy*, 53 F.4th 1338 (11th Cir. 2022) (recognizing that a district court cannot consider unsworn statements in ruling on a summary judgment motion, and that unsworn statements are incompetent to raise a fact issue precluding summary judgment).

[9] Both Defendants question the applicability of the Prison Litigation Reform Act (PLRA), because Smith was not incarcerated at the time of the relevant incident. *See* Doc. 25 at 2 n.2; Doc. 35 at 1 n.1.  But, for purposes of the PLRA, the court must look to a prisoner's status at the time that he filed his lawsuit, and not at the time of the underlying incident.  *See, e.g.*, *Harris v. Garner*, 216 F.3d 970, 977–78 (11th Cir. 2000).  At the time that he filed this action, Smith was detained at the Montgomery County Detention Facility.  Doc. 1 at 2.

Procedure 56.  Doc. 39; *see Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).

On November 23, 2022, Smith filed another unsworn response.  Doc. 41. Among other things, Smith asserted that Sandlin did not receive medical attention for his ribs, and that Sandlin made false statements about Smith hitting Sandlin with his vehicle.  Doc. 41 at 2–3.  Smith also asserted that Dawkins supported a warrant without investigation, and incorrectly stated that Smith ran from the ambulance.  Doc. 41 at 3.  Smith stated that "the ADOC is trying to cover their mistake" after they forced him "to stop and dr[agged] him out [of] the vehicle and beat him."  Doc. 41 at 4.

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A material fact is one that might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

To avoid summary judgment, the nonmovant must go beyond the allegations to offer specific facts that create a genuine dispute for trial.  *Celotex*, 477 U.S. at

324–25.  The court's job is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  The court must construe all evidence and draw all reasonable inferences in the nonmovant's favor. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c).

In addition, on a defendant's summary judgment motion, the court must consider any "specific facts" that a *pro se* plaintiff pleaded in his sworn complaint. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)).  The court liberally construes a *pro se* pleading.  *See, e.g.*, *Jones v. Florida Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015) (the court should hold a *pro se* pleading to "a less stringent standard than a pleading drafted by an attorney").

Furthermore, the practical reality that a plaintiff's "evidence consists mainly of his own testimony in his verified complaint, sworn response, and sworn affidavit does not preclude a finding that a genuine dispute of material fact exists." *Sears v. Roberts*, 922 F.3d 1199, 1208 (11th Cir. 2019).  And, "[e]ven if his sworn statements turn out to be exaggerations or false, they are enough to raise a genuine issue of material fact" for trial.  *Id.* at 1209.  On a summary judgment motion, a

court cannot make credibility determinations. *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006).

## DISCUSSION

Liberally construing Smith's amended complaint, Smith alleges the following claims:  (1) a claim for false arrest against Defendant Dawkins; (2) a claim that Defendant Sandlin lied at the parole revocation hearing to have Smith's parole revoked; (3) a claim against Defendant Sandlin for excessive force; (4) a due process claim against Defendant Dawkins for damage to Smith's vehicle; and (5) a claim against the ADOC and "Internal Investigations" for employing tortfeasors.  Doc. 15.  The court should grant Defendants' summary judgment motions, and dismiss each of these claims.

## I.    The court should dismiss without prejudice Smith's claim against Dawkins for false arrest under the *Younger* abstention doctrine.

The court should dismiss without prejudice Smith's claim against Dawkins for false arrest based on *Younger* abstention.  Generally speaking, the *Younger* abstention doctrine provides that, "based on principles of comity and federalism, a federal court should not interfere with ongoing state criminal proceedings where the state court conviction and/or sentence is not yet final." *Johnson v. Florida*, 32 F.4th 1092, 1099 (11th Cir. 2022); *see Younger v. Harris*, 401 U.S. 37, 41–45 (1971) (invoking the "national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances").

14

The *Younger* abstention doctrine is based on the premise that a pending state prosecution will provide the accused with a sufficient chance to vindicate his federal constitutional rights. *Hughes v. Attorney Gen. of Fla*., 377 F.3d 1258, 1263 n.7 (11th Cir. 2004). Pursuant to *Younger*, abstention is required under the following circumstances: "(1) state proceedings, judicial in nature, are pending; (2) the state proceedings involve important state interests; and (3) the state proceedings afford adequate opportunity to raise the constitutional issue." *Johnson*, 32 F.4th at 1099.

Here, Smith faces a pending criminal prosecution for second degree assault, which involves important state interests that are expressed in Alabama's criminal statutes. *See Johnson*, 32 F.4th at 1099 (reasoning that "a state's criminal prosecution implicates important interests concerning the state's police power"). As a result, Smith's case meets the first two requirements for *Younger* abstention. *See id.*

Smith's case also meets the third requirement because the pending state criminal proceedings afford Smith adequate opportunity to raise the constitutional challenges. *See generally Kowalski v. Tesmer*, 543 U.S. 125, 133 (2004) (holding that cases were properly dismissed under *Younger* where there was opportunity in pending state criminal proceedings to raise constitutional challenges); *Boyd v. Georgia*, 512 F. App'x 915, 918 (11th Cir. 2013) (affirming the dismissal of a §

1983 complaint because the plaintiff's "state criminal proceeding is ongoing, implicates an important state interest, and will provide an adequate opportunity for [the plaintiff] to raise constitutional challenges").

To the extent that Smith challenges the validity of his arrest, his detention, and the charges against him, the pending criminal case affords him the opportunity to litigate those challenges in the state trial court, and through direct appeal and/or collateral review thereafter (if appropriate). *See Chen ex rel. V.D. v. Lester*, 364 F. App'x 531, 535 (11th Cir. 2010) (holding that, where the plaintiffs "did not allege any facts indicating that they were precluded from raising their constitutional concerns in the state court proceedings, . . . the district court was justified in assuming that state procedures offer an adequate opportunity to raise constitutional issues"). Because Smith can raise in the pending state court criminal action any issues related to Dawkins' conduct in connection with his arrest,[10] the court should dismiss without prejudice Smith's claim against Dawkins for false arrest. *See Smith v. Mercer*, 266 F. App'x 906, 908 (11th Cir. 2008) ("A dismissal pursuant to

---

[10] Dawkins construes Smith's allegations that Dawkins sought a warrant for Smith based on false information as a Fourteenth Amendment due process claim. Doc. 35 at 11. But Smith does not allege any procedural shortcomings in Dawkins' obtaining that warrant. Instead, Smith asserts that Dawkins wrongfully initiated the charges without probable cause, which is grounded in Fourth Amendment malicious prosecution. *See, e.g.*, *Thompson v. Clark*, 142 S. Ct. 1332, 1337–38 (2022) ("[T]he gravamen of the Fourth Amendment claim for malicious prosecution, as this Court has recognized it, is the wrongful initiation of charges without probable cause."). Regardless, any such claim—whether grounded in the Fourteenth Amendment or the Fourth—is barred by *Younger*.

the *Younger* doctrine is without prejudice, and does not preclude later re-filing of the complaint.").

## II. The court should dismiss without prejudice Smith's claim against Sandlin for alleged false statements at Smith's parole revocation hearing under the *Heck* bar.

The court should dismiss without prejudice Smith's claim against Sandlin for alleged false statements at Smith's parole revocation hearing pursuant to *Heck*. Smith's claim that Sandlin lied at Smith's parole revocation hearing is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). The Court in *Heck* stated that, where a prisoner seeks damages for unconstitutional imprisonment, he first must have his conviction or sentence reversed on appeal or otherwise declared invalid before pursuing relief through § 1983. *Id.* at 486–87 (holding that, "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254"); *see also Thompson v. Clark*, 142 S. Ct. 1332, 1335 (2022) ("To maintain that Fourth Amendment claim under § 1983, a plaintiff . . . must demonstrate, among other things, that he obtained a favorable termination of the underlying criminal prosecution.").

The *Heck* bar has been extended to claims challenging parole revocations. *See, e.g.*, *Green v. McGill-Johnston*, 685 F. App'x 811, 812 (11th Cir. 2017) (holding that the district court correctly determined that a prisoner's § 1983 challenge to his parole revocation was barred by *Heck*); *Vickers v. Donahue*, 137 F. App'x 285, 289–90 (11th Cir. 2005) (determining that the plaintiff "could have appealed the revocation order and, had he prevailed, his § 1983 claims would not be barred by *Heck*").[11]

In this case, Smith challenges the revocation of his parole.[12]  Smith asserts that Sandlin lied at his parole revocation hearing when he testified that Smith hit him with his vehicle.  Doc. 15 at 12; Doc. 41 at 2, 3.  Smith's allegations "would have necessarily implied the invalidity of his confinement" on his parole revocation.  *See Green*, 685 F. App'x at 812.  Because Smith has not had his parole

---

[11] Other federal circuit courts of appeals also have ruled that *Heck* bars any § 1983 challenges to parole revocations.  *See, e.g.*, *Beck v. City of Muskogee Police Dep't*, 195 F.3d 553, 560 n.5 (10th Cir. 1999); *Jackson v. Vannoy*, 49 F.3d 175, 177 (5th Cir. 1995) (holding that *Heck* barred claims that would imply the invalidity of a parole revocation proceeding); *Butterfield v. Bail*, 120 F.3d 1023, 1025 (9th Cir. 1997) (holding that *Heck* barred a § 1983 challenge to the denial of parole); *Littles v. Board of Pardons & Paroles Div.*, 68 F.3d 122, 123 (5th Cir. 1995) (same).

[12] To the extent that Smith seeks release from custody, he must pursue that relief through an action for habeas corpus.  "[H]abeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release, even though such a claim may come within the literal terms of § 1983."  *Heck*, 512 U.S. at 481; *see also Cook v. Baker*, 139 F. App'x 167, 169 (11th Cir. 2005) (holding that the "exclusive remedy" for a state prisoner's claim challenging the basis for or validity of his incarceration "is to file a habeas corpus petition").

revocation reversed, expunged, invalidated, or set aside by habeas corpus, Smith cannot proceed on any claim that Sandlin lied at that hearing. *See, e.g.*, *McNair v. Bernard*, 2018 WL 1960859 (11th Cir. March 27, 2018) (holding that, where the plaintiff challenged the validity of his parole revocation itself, he could not proceed on a § 1983 claim that "necessarily impl[ies] the invalidity of [a] conviction or sentence, and, therefore, he would not have a cause of action and cannot file suit until that conviction or sentence has been invalidated"). Thus, the court should dismiss without prejudice Smith's claim against Defendant Sandlin for allegedly making false statements at Smith's parole revocation hearing.

## III. The court should dismiss with prejudice Smith's Fourth Amendment excessive force claim against Sandlin because Sandlin is entitled to qualified immunity.

The court should dismiss with prejudice Smith's Fourth Amendment excessive force claim because Sandlin is entitled to qualified immunity. The Fourth Amendment guarantees the right of persons to be free from unreasonable seizures. U.S. Const. amend. IV; *Charles v. Johnson*, 18 F.4th 686, 699 (11th Cir. 2021) (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)); *see Stephens v. DeGiovanni*, 852 F.3d 1298, 1321 (11th Cir. 2017). As such, "[t]he Fourth Amendment prohibits the use of excessive force during an arrest." *Baxter v. Roberts*, 54 F.4th 1241, 1268 (11th Cir. 2022).

In this context, a plaintiff's excessive force claim is "analyzed under the

Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395.

Under that standard, "the question is whether the officers' actions are 'objectively

reasonable' in light of the facts and circumstances confronting them." *Id.* at 397.

"The calculus of reasonableness must embody allowance for the fact that police

officers are often forced to make split-second judgments—in circumstances that

are tense, uncertain, and rapidly evolving—about the amount of force that is

necessary in a particular situation." *Id.* at 396–97.

In assessing allegations of excessive force under the Fourth Amendment, a

court must consider "(1) the severity of the crime at issue, (2) whether the suspect

poses an immediate threat to the safety of the officers or others, and (3) whether

the suspect is actively resisting arrest or attempting to evade arrest by flight."

*Richmond v. Badia*, 47 F.4th 1172, 1182 (11th Cir. 2022) (citing *Graham*, 490 U.S.

at 396). The court also must consider "the justification for the application of force,

the relationship between the justification and the amount of force used, and the

extent of any injury inflicted." *Id.* (citing *Saunders v. Duke*, 766 F.3d 1262, 1267

(11th Cir. 2014)).

The right to make a seizure "necessarily carries with it the right to use some

degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at

396. And the Eleventh Circuit has stated that "the application of de minimis force,

without more, will not support a claim for excessive force in violation of the

Fourth Amendment." *Baxter*, 54 F.4th at 1269 (quoting *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000)).  Further, the Eleventh Circuit has held that "painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal." *Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019) (quotation marks omitted).  "Not every push or shove" violates the Fourth Amendment.  *Graham*, 490 U.S. at 396.

In addition, qualified immunity provides "complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (quotation marks omitted).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Saunders*, 766 F.3d at 1266 (quoting *Lane v. Franks*, 573 U.S. 228, 243 (2014)).

In order to receive the protection of qualified immunity, a government official first must show that he was acting within the scope of his discretionary authority at the time of the alleged wrongful conduct.  *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022).  If the defendant makes that showing, then "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* (quoting *Penley v. Eslinger*, 605 F.3d 843, 849 (11th Cir. 2010)).

To overcome qualified immunity, a plaintiff then must show (1) that the defendant official violated a constitutional right, and (2) that the right was clearly established at the time of the alleged violation. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). A court may address these two prongs "in either order." *Waldron v. Spicher*, 954 F.3d 1297, 1304 (11th Cir. 2020).

Assessing whether an alleged use of force was excessive under the Fourth Amendment depends on the "totality of the circumstances." *Charles*, 18 F.4th at 699 (quoting *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)); *see also Marantes v. Miami-Dade Cty.*, 776 F. App'x 654, 666 (11th Cir. 2019) (affirming summary judgment for the defendant, and concluding that the defendant officer's "use of force was not objectively unreasonable and, thus, not excessive under the totality of the circumstances in this case" (citing cases)).

Furthermore, for a right to be clearly established, a plaintiff can either identify case precedents with materially similar facts, or show that the violation was so obvious that every reasonable officer would know that his actions were unconstitutional. *Corbitt v. Vickers*, 929 F.3d 1304, 1311–12 (11th Cir. 2019). In other words, the law must give the defendant officer "fair warning" that his conduct is unconstitutional. *Piazza v. Jefferson Cty., Ala.*, 923 F.3d 947, 955 (11th Cir. 2019) (citations omitted). In analyzing qualified immunity, courts focus not only on the state of the law, but on the factual information that the defendant

possessed at the time. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (stating that the qualified immunity analysis "will often require examination of the information possessed by" the defendant officials).

Importantly, "[q]ualified immunity provides 'an entitlement not to stand trial . . . , conditioned on the resolution of the essentially legal [immunity] question.'" *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1280 (11th Cir. 1998) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996)) (quotation marks omitted).

In this case, qualified immunity bars Smith's excessive force claim against Sandlin. Even if Smith can show a genuine dispute of material fact on the question whether Sandlin violated Smith's Fourth Amendment right, Smith cannot show that this right was clearly established on the record evidence in this case.

Liberally construed, Smith alleges that Sandlin violated his Fourth Amendment right in using excessive force against him during a traffic stop. Doc. 15 at 7, 11–12. In his sworn amended complaint,[13] Smith alleges that he was "beaten" by Sandlin, and that he sustained a "swollen" head, bruised ribs, and pain in his heart, and that he needed a pacemaker. Doc. 15 at 7, 12. According to Smith, after he drove back to Sandlin's location (i.e., after the initial encounter):

---

[13] On this summary judgment motion, the court can consider the sworn allegations in Smith's amended complaint. *See Caldwell*, 748 F.3d at 1098. But, because Smith's responses were not properly sworn (Doc. 27; Doc. 41), the court cannot consider those submissions. *See Roy*, 53 F.4th at 1347–48. Consideration of those unsworn responses would not change the result anyway.

"when I got out of my car the correctional office[r] beat me, kick[ed] me three times in my side with handcuff[s] on and has his knee on my back."  Doc. 15 at 11.

In his sworn complaint, Smith concedes that he did not comply with Sandlin's instructions in their initial encounter, and instead he drove away.  Doc. 15 at 11.  Smith also concedes that he refused medical care after the alleged incident.  Doc. 15 at 11.

Moreover, the undisputed evidence submitted by Defendants shows that Smith hit Sandlin with the sideview mirror of his vehicle.  Doc. 25-1 at 2; Doc. 25-3 at 1; Doc. 25-4 at 1; Doc. 25-5 at 2; Doc. 25-6 at 2.  With respect to the officers' seizure of Smith, Defendants' evidence shows that Smith was ordered to exit the vehicle, and that Smith was handcuffed/detained.  Doc. 25-4 at 1; Doc. 35-6 at 3.  As a factual matter, Defendants' evidence shows that it was Defendant Sanders— and not Sandlin—who took Smith into custody, and that Sandlin only encountered Smith while Smith was inside his vehicle.  *See* Doc. 25-1 at 2–3; Doc. 25-4 at 1; Doc. 25-6 at 3.  On that version of the facts, Sandlin did not use any force at all against Smith.  *See* Doc. 25 at 15–17.

But, liberally construing in Smith's favor his sworn allegations, the record evidence, and all reasonable inferences, Smith has created a disputed issue of fact on whether Sandlin used force in seizing him.  *See* Doc. 15 at 7, 11–12; *Sears*, 922 F.3d at 1208.

On the qualified immunity analysis, Defendants assert that Sandlin was acting within his discretion as a correctional officer (Doc. 25 at 13–14), and Smith does not dispute that fact. *See Powell*, 25 F.4th at 920. Consequently, the burden shifts to Smith to show that qualified immunity does not apply. *See id.* To show that qualified immunity does not apply, Smith's sworn allegations must show that Sandlin's alleged conduct violated a constitutional right that was clearly established. *See Marbury*, 936 F.3d at 1232.

In this case, Smith's sworn allegations do not show the violation of a clearly established Fourth Amendment right. The Eleventh Circuit has stated that, because the standard for excessive force under the Fourth Amendment "establishes no bright line, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in the officer's position to conclude the force was unlawful." *Sebastian*, 918 F.3d at 1308 (quotation marks and alteration omitted). Under that framework, the Eleventh Circuit has "repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Id.* (quoting *Stephens*, 852 F.3d at 1328).

Here, Smith cannot carry his burden of showing that qualified immunity does not apply because he cannot show that "every reasonable officer" in Sandlin's

25

position would "conclude the force was unlawful." *Sebastian*, 918 F.3d at 1308. In this regard, the Eleventh Circuit has "held that it may be reasonable for an officer to use force against a suspect who is resisting and not subdued." *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1272–73 (11th Cir. 2021) (collecting cases involving use of force, including one involving kicking, where suspects were partially subdued but resisting). Smith has produced no evidence indicating that any alleged force—including kicking three times and putting a knee on his back— was not reasonable under the totality of the circumstances. *See Marantes*, 776 F. App'x at 666; *Richmond*, 47 F.4th at 1182. At the time of the alleged use of force, officers were responding to reports of suspicious activity near Donaldson, Smith already had refused to comply with Sandlin's orders to provide identification and had driven away upon questioning. Doc. 25-1 at 2; *see Richmond*, 47 F.4th at 1182. Smith also had hit Sandlin with the sideview mirror of his vehicle. Doc. 25-1 at 2–3; Doc. 25-3 at 1; Doc. 25-6 at 2. Thus, in determining what amount of force to apply, it would have been reasonable for Sandlin, Sanders, and/or the other officers to consider that Smith had assaulted an officer, could pose a safety threat to the officers, already had refused to comply with officer instructions, and already had evaded the officers. *See Richmond*, 47 F.4th at 1182.

Further, the "nature and extent of physical injuries sustained by a plaintiff are key factors in determining whether the use of force was reasonable."

*Sebastian*, 918 F.3d at 1309 (quotation marks omitted).  Here, Smith does not allege that he was seriously injured, and instead alleges that he sustained a "swollen" head, bruised ribs, and pain and suffering—as well as an apparently unrelated need for a pacemaker.  Doc. 15 at 7.  Smith refused medical attention after the alleged incident, and has identified no evidence from which a factfinder could find serious or lasting injuries.  Doc. 15 at 11.  Without more, the sworn allegations that Sandlin used some force in handcuffing and seizing Smith does not show a clearly established Fourth Amendment violation.  *See Graham*, 490 U.S. at 396 (the right to make an investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it"); *Baxter*, 54 F.4th at 1269 ("the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment"); *Sebastian*, 918 F.3d at 1308 ("painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal"); *see also, e.g.*, *Jones v. City of Dothan*, 121 F.3d 1456, 1458, 1460–61 (11th Cir. 1997) (use of force was de minimis and did not violate the Fourth Amendment where officers slammed the suspect against the wall, kicked his legs apart, and required him to raise his arms above his head in carrying out arrest).

Even if a reasonable factfinder could find that Sandlin used excessive force in violation of Smith's Fourth Amendment right, that right was not clearly

established under the circumstances of this case. *See Marbury*, 936 F.3d at 1232. In light of the record evidence discussed above, and the factual information that Sandlin undisputedly possessed at the time that he allegedly seized Smith, Smith has not shown that Sandlin had "fair warning" that the alleged use of force was unconstitutional. *See Anderson*, 483 U.S. at 641; *Piazza*, 923 F.3d at 955. At summary judgment, it is Smith's burden to show that Sandlin "use[d] gratuitous and excessive force," and that Smith "[wa]s under control, not resisting, and obeying commands" (*Sebastian*, 918 F.3d at 1308); and Smith has not done so. *See Powell*, 25 F.4th at 920. That is particularly true because the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Accordingly, the court should dismiss with prejudice Smith's excessive force claim against Sandlin based on qualified immunity.

**IV.   The court should dismiss with prejudice Smith's claim against Dawkins for alleged property damage to his vehicle because there is no ground for constitutional liability.**

The court should dismiss with prejudice Smith's claim against Dawkins for alleged property damage to his vehicle because there is no ground for any constitutional liability. The U.S. Supreme Court has held that even "an

unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) ("[O]nly when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise."). The state remedy does not need to provide for recovery to the same extent as a § 1983 action in order to be "meaningful." *Hudson*, 468 U.S. at 535.

The State of Alabama, through its Board of Adjustment, provides a meaningful post-deprivation remedy for a prisoner to seek redress for missing or confiscated property. *See* Ala. Code § 41-9-60, et seq. The Alabama Board of Adjustment considers claims against the State or its agents, and "provide[s] a method of payment by the State of Alabama . . . to persons for injuries to person or property," where compensation for the injury "should be paid." *Id.*; *see also Smith v. Governor of Ala.*, 562 F. App'x 806, 817–18 (11th Cir. 2014) (holding that the Alabama Board of Adjustment, pursuant to Ala. Code § 41-9-60, et seq., provides a meaningful post-deprivation remedy through which a state prisoner can seek relief for the loss or denial of property, even though any recovery may not be equivalent to a § 1983 action).

So, to the extent that Smith seeks to recover money for damage to his vehicle, that claim must be brought before the Board of Adjustment. *See Pettco Enters., Inc. v. White*, 896 F. Supp. 1137, 1141–42 (M.D. Ala. 1995), *aff'd*, 98 F.3d 1353 (11th Cir. 1996) (recognizing that the State requires all claims against the ADOC to be filed with the Board of Adjustment).  If the Board of Adjustment denies the claim, Smith may then bring an action in Alabama state court for redress.  *See Carmichael v. State Board of Adjustment*, 32 So. 2d 216, 217 (Ala. 1947).  As such, the post-deprivation remedies available to Smith under Alabama law satisfy due process.  *See Hudson*, 468 U.S. at 534–35; *Holt v Givens*, 757 F. App'x 915, 922 (11th Cir. 2018) (recognizing that the Alabama Board of Adjustment process provides an adequate post-deprivation remedy); *Browning v. City of Wedowee, Ala*., 883 F. Supp. 618, 623 (M.D. Ala. 1995) (holding that the Alabama Board of Adjustment process under Ala. Code § 41-9-60, et seq., and Alabama tort law provide sufficient remedies).  Accordingly, adequate post-deprivation remedies are available to Smith under Alabama law for any alleged property damage to his vehicle, and the court should dismiss with prejudice Smith's claim against Dawkins for any such property damage.

**V.     The court should dismiss with prejudice Smith's claims against the ADOC and "Internal Investigations" because those Defendants are immune from suit.**

The court should dismiss with prejudice Smith's claims against the ADOC

and "Internal Investigations" because they are immune from suit.  Smith names the ADOC and "Internal Investigations" as Defendants because those entities employ Sandlin and Dawkins, respectively.  Doc. 15.  But those Defendant entities are entitled to summary judgment because they are immune from suit.

The Eleventh Amendment bars a lawsuit against a state or one of its agencies or departments, unless the state has waived its Eleventh Amendment immunity or Congress has abrogated that immunity.  *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1524–25 (11th Cir. 1990).  In this regard, the State of Alabama has not waived its Eleventh Amendment immunity, and Congress has not abrogated Eleventh Amendment immunity for claims under § 1983.  *Id.* at 1525.

The ADOC is an agency of the State of Alabama and consequently immune from suit under the Eleventh Amendment.  "Internal Investigations" is a division of the ADOC and similarly immune from suit.[14]

Smith's allegation that the ADOC and "Internal Investigations" employed Defendants Sandlin and Dawkins does not change this result because "liability under § 1983 may not be based on the doctrine of respondeat superior."  *Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011); *see also Monell v.*

---

[14] To the extent that Smith seeks to bring claims against Defendants Sandlin and Dawkins in their official capacities, any such claims likewise would be barred by Eleventh Amendment immunity.  *See, e.g., Buford v. Alabama Dep't of Corr.*, No. CV 1:20-00006-WS-N, 2020 WL 1901070, at *1 (S.D. Ala. Jan. 9, 2020), *report & recommendation adopted*, 2020 WL 587647 (S.D. Ala. Feb. 6, 2020).

*Department of Soc. Servs.*, 436 U.S. 658, 692 (1978) (ruling that § 1983 "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor"). As a result, the court should dismiss with prejudice Smith's claims against the ADOC and "Internal Investigations."

## RECOMMENDATION

For the reasons stated above, this report **RECOMMENDS** that the court **GRANT** Defendants' summary judgment motions (Doc. 25; Doc. 35), **DISMISS WITHOUT PREJUDICE** Plaintiff Smith's claim for false arrest under the *Younger* abstention doctrine and claim for alleged false statements under *Heck*, and **DISMISS WITH PREJUDICE** Smith's other claims.

## NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation. Any objections must be filed with the Clerk of Court within **14 days**. The objecting party must identify every objectionable finding of fact or recommendation and state the specific basis for every objection. The objecting party also must identify every claim in the complaint that the report and recommendation has not addressed. Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

A party who fails to object to factual or legal conclusions in the Magistrate

Judge's report and recommendation waives the right to challenge on appeal those same conclusions adopted in the District Judge's order. Without a proper objection, however, the court on appeal may review the unobjected-to factual and legal conclusions for plain error if necessary in the interests of justice. 11th Cir. R. 3-1.

After receiving the objections, a District Judge will conduct a *de novo* review of the relevant portions of the report and recommendation and may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings of fact and recommendations. The District Judge also may refer this action back to the Magistrate Judge with instructions for further proceedings.

A party may not appeal the Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. A party may appeal only from a final judgment entered by a District Judge.

**DONE** this June 27, 2023.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE